Janice NOVOSAD, Appellant,

v.

MID–CENTURY INSURANCE COMPANY, Appellee.

No. 04–93–00375–CV.

Court of Appeals of Texas, San Antonio.

July 27, 1994.

Robert E. Valdez, Linda Daniels, Robert E. Valdez, P.C., San Antonio, for appellant.

Robert F. Scheihing, Small, Craig & Werkenthin, P.C., San Antonio, for appellee.

Before CHAPA, C.J., and LOPEZ and STONE, JJ.

STONE, Justice.

Janice Novosad sued Mid–Century Insurance Company of Texas (Mid–Century), under the uninsured/underinsured provisions of her automobile insurance policy for personal injuries sustained when Novosad was involved in an accident with a third party. Mid–Century stipulated to the negligence of the underinsured third party prior to the presentation of any evidence to the jury. By

virtue of this stipulation, the only issues presented at trial were the nature and extent of Novosad's injuries and the amount of reasonable attorney's fees incurred by Novosad. Among other damages, Novosad was awarded $7,600 for past and future medical care. On appeal, Novosad argues she is entitled to a new trial because the medical care award fails to provide for the cost of future surgery. By way of cross-point, Mid–Century contends the trial court erred in awarding Novosad attorney's fees because such fees are not recoverable in an underinsured motorist case. We affirm.

In her first point of error, Novosad contends she established as a matter of law that her medical damages exceeded $7,600. Novosad does not assert, however, that she established any particular amount of damages as a matter of law. Thus, if we find this case must be reversed, there is no basis for us to render a different judgment. Further, Novosad has not prayed for reversal and rendition, but asks only that we reverse the judgment and remand the cause for a new trial. For this reason, we need only address points of error two and three, the "great weight and preponderance of the evidence" points.

In points two and three, Novosad contends the jury's award of $7,600 for medical care was against the great weight and preponderance of the evidence. In addressing this point, we must assess all the evidence and reverse for a new trial only if the finding of $7,600 in damages is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). "[I]n considering great weight points complaining of a jury's failure to find a fact [or failure to find damages], courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). We must also bear in mind that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex.1982).

The accident at issue occurred on October 11, 1990 when an underinsured motorist negligently ran Novosad off the road causing her vehicle to turn over. Novosad injured her neck and back. On the day following the accident, Novosad sought treatment from her family physician, who advised her that she needed to consult with a specialist. Novosad then sought medical treatment from Dr. Peter Holmes. Dr. Holmes, who is board certified, saw Novosad on four occasions between October 23, 1990 and February 13, 1991. Based upon her x-rays, Dr. Holmes concluded Novosad had an evulsion fracture, or had "pulled off a piece of bone" from her spine, which he indicated could have existed prior to the accident. At no time during his treatment did Dr. Holmes conclude that Novosad needed back surgery. Rather, he prescribed physical therapy treatments. In records from his last visit with Novosad, Dr. Holmes indicated she was "doing fantastic" as a result of the therapy. Despite this description of Novosad's condition, Dr. Holmes ordered a magnetic imaging test ("MRI") because Novosad still complained of pain. The MRI was performed in March of 1991. Dr. Holmes reviewed the MRI and the MRI report filed by the radiologist, and was still of the opinion that Novosad did not need surgery. Novosad did not receive the results of the MRI from Dr. Holmes, nor did she ever return to see him.

After approximately nine months without treatment of any kind, and more than one year after the accident, Novosad saw Dr. David Dennis, a board certified orthopedic surgeon. On her first visit to Dr. Dennis, Novosad complained of back pain and numbness, but she was able to bend down, touch her toes, and extend with mild pain. He noted she had no muscle spasms or tightness, which are objective signs of a herniated disc. Likewise, Dr. Dennis did not detect nerve damage or nerve weakness, common problems which occur with a herniated disc. An x-ray taken of Novosad's back revealed Novosad had damaged her lumbar spine area probably as a child or teenager, but in any event prior to the accident.

In addition to his examination of Novosad, Dr. Dennis obtained the MRI for review and

read the attached radiologist's report interpreting the film. Based to some extent on the MRI, Dr. Dennis concluded there was a reasonable probability Novosad would need back surgery at some point in the future to correct a herniated disc. He also said that if there were no herniated disc, there would be no reason for surgery. Dr. Dennis did not recommend surgery when he saw Novosad in December 1991, stating that Novosad was the only one able to tell him when she was ready to have surgery. He also noted "at this time, she can handle her pain level, and because of this, I would not recommend the surgery at this time."

When Dr. Dennis saw Novosad a month and a half later, in January 1992, Novosad still experienced pain, but was keeping up with her family and social activities fairly well. He stated that as a result of physical therapy, she was able to get on with her life in spite of any pain she was having. In fact, Dr. Dennis stated she had done so well in physical therapy that she could forego epidural injections which had been suggested in the past. Dr. Dennis also reported, however, that Novosad "may need to consider surgery." In his deposition, Dr. Dennis stated he chose his words very carefully, and that if he had believed she definitely needed surgery in January 1992, he would have said the same in his report.

Dr. Dennis did not see Novosad after the January 1992 visit for approximately nine months. Two and one-half months prior to trial, Novosad visited with the doctor and reported "some pain down the left leg which she had not had before and just a checkup." In his November 2, 1992 report, Dr. Dennis stated that therapy had worked to date, but if it quit working, the next step would be an epidural injection to relieve pain. If the epidural was not effective, Dr. Dennis would schedule a discogram to confirm that Novosad had a ruptured disc and, therefore, required surgery. At the time of trial Dr. Dennis had neither recommended surgery nor performed either the epidural injection or discogram.

Novosad underwent four blocks of physical therapy treatment with Dr. Steve Stratton, a physical therapist to whom she was referred by both Drs. Holmes and Dennis. The first round of treatment was successful. According to Stratton, Novosad's pain was reduced approximately ninety percent during the first round of therapy. The second round of treatment was also successful, with all therapy goals being reached and pain being reduced to virtually nothing. In a September 1991 report, Stratton wrote that Novosad essentially had full range of motion, no point tenderness, and no lack of flexibility. The record also indicates that she received no physical therapy for a period of five months, presumably because she was still doing well. The third block of treatment with Stratton was under the direction of Dr. Dennis. Stratton testified that Novosad admitted to him that she had not followed his advice between the second and third blocks of treatment to follow a home exercise program. Novosad again responded well during the third block of treatment and her pain was reduced to almost nothing.

Finally, beginning on November 10, 1992, Novosad went through a fourth block of therapy treatment with Stratton which ended approximately six weeks prior to trial. At the conclusion of the fourth block of treatment, Stratton indicated Novosad had again experienced a reduction in pain. On January 7, 1993, Stratton wrote a letter to Dr. Dennis stating that Novosad's pain had been reduced with each treatment, but that Stratton was "closing out" Novosad's records, after trying unsuccessfully to reach her several times, because of Dr. Dennis' request to see Novosad before further physical therapy treatments. Up until this time, Dr. Dennis had recommended to Novosad that she return to physical therapy "whenever she wanted," or on an "as needed" basis, without first seeing Dr. Dennis. The letter also indicated Novosad was not experiencing any leg pain, which is symptomatic of a lower back injury. Contrary to his written records, Stratton testified that Novosad did not respond to the physical therapy as a whole since Novosad's pain eventually returned after each block of treatment.

Dr. J. Randy Jinkins, the Director of Neuroradiology at the University of Texas Health Science Center, reviewed the MRI

film ordered by Dr. Holmes and utilized by Dr. Dennis. While Dr. Jinkins indicated that disc herniation was a possibility, his conclusion was that Novosad suffered from a mild narrowing of the L4–5 intervertebral disk with circumferential bulging and dehydration. In his opinion, there was "[n]o definite evidence of disc herniation."

At trial, Novosad testified that although she received encouraging results from the physical therapy, the pain always returned. She conceded, however, that she had not followed the exercise program recommended by her physical therapist. She stated she continued to work on a full-time basis between the accident and the trial, missing only eleven or twelve days. Novosad stated in her pre-trial deposition that therapy had helped her condition and she needed to go back to therapy immediately. At trial, however, she admitted she chose to wait until November 8, 1992 before doing so. Finally, Novosad testified that the physical therapy was no longer working, but admitted she did not request surgery, nor had it been recommended, scheduled or planned. In fact, Novosad testified she would not even consider surgery unless it was convenient to her work schedule as a teacher.

■ In question one, the jury was asked to assess a sum of money that would fairly and reasonably compensate Novosad for her injuries which resulted from the accident in question. In response to that portion of the question relating to "medical care," the jury awarded a lump sum of $7,600. Because the jury was not asked to make separate awards for past and future medical care costs, we must assess the sufficiency of the medical care award as a whole. Even so, it is instructive to examine the evidence supporting an award for each individual element as bearing on the sufficiency of the whole.

## Past Medical Expenses

Novosad introduced evidence showing that her past medical expenses totalled $7,200. The jury may have concluded that some of those expenses would have been incurred anyway because Novosad's expert, Dr. Dennis, testified her x-ray revealed Novosad had done damage to her lumbar spine as a child

or teenager. This is also true of the charges for treatment by Dr. Holmes, who treated Novosad for an evulsion fracture, a condition which may have existed prior to the accident.

## Future Medical Expenses

■ If Novosad has surgery, which Dr. Dennis stated would probably be required in the future, her future medical costs would range from approximately $20,000 to $30,000. The jury was free to conclude, however, based on Novosad's statements, that Novosad would not consent to surgery in the future. Also the jury may have believed Novosad's pain was related to lengthy delays between therapy treatments and Novosad's failure to follow prescribed home exercises, rather than a need for surgery. A jury may disbelieve an interested witness even if her testimony is uncontradicted. *McGuffin v. Terrell*, 732 S.W.2d 425, 428 (Tex.App.—Fort Worth 1987, no writ).

■ The jury was also free to disbelieve Dr. Dennis' opinion testimony concerning the need for and cost of future medical care. A jury may choose to be guided by expert testimony on future medical damages, but it is not bound by it. *Keller Indus., Inc. v. Reeves*, 656 S.W.2d 221, 227 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *see also Clark v. McFerrin*, 760 S.W.2d 822, 828 (Tex.App.—Corpus Christi 1988, writ denied). "Testimony of experts [on damages] is only evidentiary and not binding upon the trier of fact." *Hebert v. Pan Am. Van Lines, Inc.*, 681 S.W.2d 221, 222 (Tex.App.—Houston [14th Dist.] 1984, no writ).

■ Uncontroverted expert testimony may be regarded as conclusive if the nature of the subject matter requires the jury to be guided solely by the opinion of experts and the evidence is otherwise credible and free from contradictions and inconsistency. *Mack v. Moore*, 669 S.W.2d 415, 419 (Tex. App.—Houston [1st Dist.] 1984, no writ); *Exxon Corp. v. West*, 543 S.W.2d 667, 672 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.), *cert denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 154 (1977). Here, there was contradicting expert testimony presented, and even Dr. Dennis' testimony

was not free from contradictions and inconsistency. Juries are not bound by a physician's diagnosis as to the future consequences of an injury. *Balandran v. Furr's Inc.*, 833 S.W.2d 648, 652 (Tex.App.—El Paso 1992, no writ) (conflicting diagnoses of MRI dispositive); *Hebert v. Pan Am. Van Lines, Inc.*, 681 S.W.2d at 222. As this Court has previously stated:

> [W]hen there is expert medical testimony concerning the future consequences of the party's injuries, the jury is not necessarily bound by such testimony.

*City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex.App.—San Antonio 1988, writ denied) (quoting *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.)). Therefore, this was a matter to be decided by the jury. For example, Dr. Dennis testified surgery was necessary, but he also stated he could not be certain surgery was necessary until he administered a discogram, which had not been done as of trial. Also, Dr. Dennis stated surgery would not be scheduled, or even recommended, unless an epidural injection, a procedure not yet administered, failed to work. Most importantly, however, Dr. Holmes testified that surgery was not necessary. "When the parties introduce conflicting testimony in a jury trial, as the parties did in this case, it is the duty of the jury to determine which witness is more credible." *Jones*, 638 S.W.2d at 866.

We also note the jury may have attached significance to the fact that the MRI, taken over one and a half years before trial, provided the only diagnostic evidence of Novosad's injuries and Dr. Dennis could not state with certainty that the MRI proved surgery was necessary. It is not our place to substitute our judgment for that of the jury, particularly where, as here, the jury has failed to find a fact upon which the appellant had the burden of proof and conflicting testimony was presented. *See Herbert v. Herbert*, 754 S.W.2d at 144.

The jury here awarded Novosad the $1,760 in lost wages she proved. Novosad also proved $7,200 in past medical expenses, and the jury awarded her $7,600 in total medical damages. She also was awarded $10,000 for pain and mental anguish and $10,000 for physical impairment. Based on these awards, we do not find any evidence that the jury's actions were based on passion or prejudice against Novosad. We cannot conclude that the jury's failure to make the requested award for future surgery costs is so against the great weight and preponderance of the evidence as to be manifestly unjust. Points one, two and three are overruled.

### Attorney's Fees

In cross-points of error one, two and three, Mid–Century contends the trial court erred in awarding Novosad $5,000 for attorney's fees. The insurance policy in question provides coverage as follows:

> We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injuries....

Mid–Century contends that it could not determine what damages Novosad was "legally entitled to recover" until the verdict was received, thus it breached no contractual duty under the policy.

Mid–Century relies upon *Sikes v. Zuloaga*, 830 S.W.2d 752 (Tex.App.—Austin 1992, no writ) to support its claim. *Sikes* involved a personal injury suit arising from an automobile accident between the plaintiff and an uninsured driver. The plaintiff sued the uninsured driver to prove liability and damages and joined her insurance company as a party defendant for failure to promptly pay her claim under the policy. The jury found the uninsured motorist at fault and determined damages at approximately $16,000, for which the court rendered judgment against the plaintiff's insurance company. The plaintiff's request for attorney's fees was denied by the trial court. *Sikes*, 830 S.W.2d 752. In affirming the trial court's denial of attorney's fees, the Austin court of appeals found that legal determination of the amount of damages was a condition precedent to any duty to pay under the policy. *Sikes*, 830 S.W.2d at 753.

The instant case is distinguishable from *Sikes*. Mid–Century consented to settlement for the insurance policy limits of the underin-

sured driver, and he was never made a party to the suit from which appeal is now taken. Additionally, liability was judicially established by virtue of Mid–Century's stipulation to the underinsured driver's negligence prior to the presentation of evidence. Thus, unlike the plaintiff in *Sikes,* Novosad established by "judgment or agreement" that the underinsured motorist was liable and legally obligated to compensate Novosad. Even more telling, counsel for Mid–Century stipulated that the money paid to Novosad by the underinsured driver was only **"partial** payment" of Novosad's damages. (Emphasis added).

 Attorney's fees are recoverable in an action on a written contract, including uninsured/underinsured motorists contracts. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986); *State Farm Mutual Auto Ins. Co. v. Clark,* 694 S.W.2d 572, 574 (Tex. App.—Corpus Christi 1985, no writ); *Prudential Ins. Co. of Am. v. Burke,* 614 S.W.2d 847, 850 (Tex.App.—Texarkana) (op. on reh'g), *aff'd per curiam,* 621 S.W.2d 596 (Tex.1981). *Burke* stated that the purpose of the exclusions in Art. 2226 (the precursor to Section 38.001) was to exclude only those actions under which attorney's fees were already recoverable under another statute. *Burke,* 614 S.W.2d at 850 (op. on reh'g). Novosad's suit does not fall within one of the exclusions under Section 38.

The elements necessary to the recovery of attorney's fees are:

(1) recovery of a valid claim on a written or oral contract;

(2) representation by an attorney;

(3) presentment of the claim to the opposing party; and

(4) failure to pay the just amount owed within thirty days of presentment.

TEX.CIV.PRAC. & REM.CODE ANN. § 38.002 (Vernon 1986); *Sikes,* 830 S.W.2d at 753. For a proper presentment to exist, the insurance company must have some liability under the contract. Liability is not in issue in this case since Mid–Century agreed to the settlement offered by the third party, stipulated as to negligence, and stipulated that the payment by the underinsured motorist was only a partial payment of Novosad's damages.

Mid–Century effectively stipulated that they owed *something* to Novosad, the only question was how much was owed under the contract. Mid–Century's contention that the amount owed under the contract must be proven to a specific amount before its insured can recover attorney's fees virtually eliminates the recovery of attorney fees in any uninsured/underinsured contract dispute, a result contrary to established case law. *Cf., Franco v. Allstate Ins. Co.,* 505 S.W.2d 789, 792 (Tex.1974) (definition of debt under Art. 5527(1) means a debt that can be ascertained by proof, not a sum certain); *Clark,* 694 S.W.2d at 574. Recovery of attorney's fees in a contract suit is allowed even when money damages are not sought. *Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex.1981) (fees recoverable in a suit for specific performance of a contract to convey real property).

 The only cause of action tried in this case was that arising under the insurance contract. Novosad established that she had a valid claim, she was represented by an attorney, and she sent a timely presentment letter, yet received no timely settlement offer. Novosad properly preserved her right to attorney's fees in her suit on the contract. Appellee's cross points of error are overruled. The judgment of the trial court is affirmed.