Sandra **PETERSON**, Appellant,

v.

**Juan Villegas REYNA and Howard Shadrock, Individually and d/b/a Shadrock Trucking Company, Appellees.**

No. 04–94–00482–CV.

Court of Appeals of Texas,
San Antonio.

Aug. 16, 1995.

Rehearing Overruled Sept. 27, 1995.

Daniel J.T. Sciano, Ronald J. Salazar, Tinsman & Houser, Inc., San Antonio, for appellant.

Edward T. Hecker, Terrence J. Martin, Martin & Strolle, P.C., San Antonio, W. Wendell Hall, Renee A. Forinash, Fulbright & Jaworski, San Antonio, for appellees.

Before HARDBERGER, DUNCAN and BUTTS, JJ.

**OPINION**

BUTTS, Justice.[1]

This is a personal injury case. After a jury trial and verdict, judgment was entered in favor of appellant, Sandra Peterson, Plaintiff below. The trial court denied Peterson's motion for new trial. We affirm.

In her first point of error, appellant argues that the jury's award of "zero" damages for

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

past physical pain and mental anguish, future medical care, and future physical pain and mental anguish is so against the great weight and preponderance of the evidence as to be manifestly unjust. In her second point, appellant maintains the trial court abused its discretion when it applied the wrong standard of review in considering and overruling appellant's motion for new trial.

The cause of action arose from an intersectional collision on October 23, 1990, between Peterson's automobile and a gravel truck driven by Juan Villegas Reyna and owned by appellee, Howard Shadrock d/b/a Shadrock Trucking Company. The jury apportioned negligence at 50% for Reyna, 20% for Shadrock, and 30% for Peterson.

It was shown that after the collision, appellant lifted her son from his car seat and displayed no sign of back or neck injuries to witnesses and police officers at the scene; she complained of minor cuts on her forehead. There was evidence she exclaimed, "Thank God, no one was hurt." Appellant declined the offer to call the EMS.

Three days later appellant visited Dr. James Richter, complaining of general physical discomfort. The doctor found no sign of a spinal injury. He did see bruising on her left knee, right leg, and in the occipital area. His diagnosis was muscle strain which required no orthopedic referral, and he prescribed Tylenol. The doctor instructed appellant to return if she continued to experience pain. Appellant did not see Dr. Richter again until April 15, 1992, and did not complain at that time of back or neck pain.

The next health care provider to testify was Dr. Frank Viola, a chiropractor, who examined appellant about a month after the accident. He performed a straight leg raising test to discover any disease of an intervertebral disk, and he found none. Dr. Viola x-rayed appellant's cervical and lumbar spine for flexion and extension views of the neck. He discovered a temporary condition, loss of lordosis, a forward curvature of the lumbar spine. He found no herniated disks and diagnosed appellant as experiencing general sprain and strain. He advised appellant to continue treatment with him, but she did not return.

On July 11, 1991, appellant was examined by Dr. Stephen Earle, an orthopedic surgeon. The doctor testified that MRIs showed three minor bulges of the disk in her neck, but they did not impact on nerves. He said moderate disk herniation at L5–L6 was shown. Dr. Earle diagnosed appellant's condition as segmental instability; however the earlier x-rays of Dr. Viola did not show this. Dr. Earle's flexion and extension x-rays indicated to him that appellant had developed retrolisthesis, a condition not shown to exist when Dr. Viola x-rayed the area. Dr. Earle recommended surgery to appellant, but up to the time of trial, she declined the operation.

She did begin physical therapy at his advice and attended a few sessions. There was evidence appellant told the therapists she was "feeling fairly good" and "feeling fine." Because she failed to attend the required sessions, they discharged appellant from the program. Appellant stated she could no longer borrow the car from a friend to drive to the sessions; in addition, after driving home she did not think the therapy was helping her.

Eighteen months after the accident Dr. Dennis Gutzman performed an independent medical examination. In contrast to Earle, he testified his viewing of the MRIs of appellant's neck did not show retrolisthesis. He agreed with Dr. Earle's findings regarding a moderate disk bulge in her neck and a moderate herniation at L5–S1. He concluded appellant could treat the neck problems with anti-inflammatory medication such as Advil or Tylenol and a home exercise program. Both doctors indicated the bulging neck disk could have been congenital. Dr. Earle would recommend surgery for the neck, and Dr. Gutzman would not.

Regarding appellant's back problems, Gutzman's testimony indicated the natural aging process might possibly account for the MRI showing a moderate herniation. However, he agreed that the temporary lordosis loss resulted from the accident. Further, he also believed that some lumbar problems resulted from the accident. Dr. Gutzman would not recommend surgery on appellant's back, although he did not rule out the possi-

ble need later. Dr. Earle recommended surgery on the back and estimated the cost of that surgery to be about $60,000 along with attendant medical care costs. There had been no operation on appellant's back at the time of trial, nor was one scheduled for the future.

The evidence shows that appellant saw doctors nine times in three and one-half years from the date of the collision. During the first month she saw two doctors (Richter and Viola); however, it was seven and one-half months after that when she saw another doctor (Earle). The injuries noted in that medical exam comprise the bases of Peterson's claims. Appellant saw Dr. Earle six times until the time of trial.

Although appellant testified to experiencing pain since the time of the accident, her brother said he did not notice her in pain until Christmas 1992 caused when her son jumped off a chair into her arms, and she fell to her knees. He said that before the accident appellant had helped him move a 250 pound desk. A close friend, LaNell Royal, stated that Peterson never admitted to her she was in pain, although it was plain her activities around the house were curtailed. Another witness noticed that appellant turned her body instead of just her head when talking to or looking at her. They all agreed appellant was not as active as she once had been. There had been no prescription for pain medication until Dr. Earle prescribed it. Appellant said she did not always take the medication because it made her dizzy and sleepy.

The jury trial continued for two weeks, and Peterson presented sixteen witnesses, including the referenced doctors and other health care providers. It was pointed out in jury argument that the jury could have observed appellant for any signs of pain or discomfort during trial, and she had displayed none; it was also stressed they could observe that she did not have to move her whole body and not just her head when she talked to another. The following broad form damages question was answered by the jury:

## QUESTION NO. 3

What sum of money, if paid now in cash, would fairly and reasonably compensate SANDRA PETERSON for her injuries, if any, that resulted from the collision in question?

Consider the elements of damage listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Do not reduce the amounts, if any, in your answers because of the negligence, if any, of SANDRA PETERSON.

Answer in dollars and cents for damages, if any, that were sustained in the past and in reasonable probability will be sustained in the future separately.

| | | |
|---|---|---|
| a. | Physical pain and mental anguish | –0– |
| b. | Physical impairment | –0– |
| c. | Medical care | 8,909.00 |
| d. | Loss of earning capacity | –0– |
| | Answer: In the Past | $ 8,909.00 |
| a. | Physical pain and mental anguish | –0– |
| b. | Physical impairment | –0– |
| c. | Medical care | –0– |
| d. | Loss of earning capacity | –0– |
| | In the Future | $ –0– |

The record reflects that the sum found as damages is exactly that proved for past medical care costs. Appellant asserts the zero findings are against the great weight and preponderance of the evidence. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634–36 (Tex.1986); *In re King's Estate,* 244 S.W.2d 660, 661–62 (Tex.1951). The supreme court set out the standard of review as follows:

> When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

*Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

Pursuant to the mandated standard of care, this reviewing court will weigh all the evidence to determine whether the jury's verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust.

■ Appellant emphasizes it was the intention of the jury to award only the amount shown for past medical expenses, and the jury failed to award damages which were proved for past pain and mental anguish and for future damages. To support the argument, appellant focuses on the jury's margin notation of $8909 beside past medical expenses. However, the supreme court has ruled with regard to a broad form damages question:

We cannot consider the margin notations as separate damage awards for purposes of evidentiary review. *See First National Bank in Dallas v. Zimmerman*, 442 S.W.2d 674 (Tex.1969); *see also Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex.1993). The Court stated in *Zimmerman* that the jury's "handwritten notation was not the jury's verdict; it merely reflected the jury's mental processes in arriving at their verdict.... The jury's reasons for reaching a particular verdict are irrelevant, at least in the absence of some overt act of misconduct."

*Thomas v. Oldham*, 895 S.W.2d 352, 359–60 (Tex.1995). In the present case no evidence has been presented that there was some overt act of misconduct by the jury. This court cannot speculate as to the jury's reasons or mental processes in awarding damages.

■ A jury's failure to find a fact means the jury was not convinced by a preponderance of the evidence. The reviewing court may not reverse simply because it concludes the evidence preponderates toward an affirmative answer. We may only reverse when the great weight of the evidence supports an affirmative answer. *Pilkington v. Kornell*, 822 S.W.2d 223, 225–26 (Tex.App.—Dallas 1991, writ denied).

■ Appellant did not report any other intervening traumatic event to the independent medical examiner or to Dr. Earle. However, there was evidence at trial that she and her ex-husband, subsequent to the accident, had engaged in some "pushing and shoving" and that he had "slapped" her. It is noted that appellant continued with her housekeeping activities except for restrictions such as in reaching overhead, and Dr.

Earle recommended no lifting of over 40 pounds.

Appellant does not emphasize particular evidence of the symptoms or signs of mental anguish shown to result from the tort. *See e.g., Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 803 (Tex.App.—Dallas 1987, no writ). Further, two of the treating physicians did not see a need for future lengthy medical procedure. Immediately after the accident, Richter recommended only Tylenol for strain. Shortly after that, the practicing chiropractor recommended physical therapy to be administered at his clinic. Both of these doctors based their opinions on x-rays taken shortly after the accident.

The orthopedic surgeon who examined appellant several months after the collision was the first one to prescribe a pain killer medication. He was also the only treating physician to recommend surgery, which appellant refused even up to the time of trial. He agreed with Dr. Gutzman in his testimony that it would be unusual for a person in pain to be able to go for seven and one-half months without treatment. The independent medical examiner did not agree that future surgery was required, believing that certain tests, such as a discogram, must first be done before the necessity for surgery could be established. There was also disagreement from this physician with other findings by the orthopedic surgeon.

■ "The mental processes by which a jury determines the amount of damages is ordinarily not cognizable by an appellate court and where the law furnishes no precise legal measure for the recovery of damages, the amount to be awarded is largely discretionary with the jury." *Terry v. Garcia*, 800 S.W.2d 854, 859 (Tex.App.—San Antonio 1990, writ denied).

■ The trier of fact has several alternatives available when confronted with conflicting evidence. It may believe one witness and disbelieve others. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). It may resolve inconsistencies in the testimony of any witness. *Id.; Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (1951). It may accept

lay testimony over that of experts. *McGalliard v. Kuhlmann,* 722 S.W.2d at 697.

 Moreover, the trier of fact is afforded considerable discretion in evaluating opinion testimony on the issue of damages. *Id.* As a general rule, it is peculiarly within the province of the jury to weigh opinion evidence and the judgment of experts. *Pilkington v. Kornell,* 822 S.W.2d at 230. It is within the province of the jury to decide which expert witness should be credited. *Id.* The testimony of an expert on the issue of damages has only evidentiary significance and is not binding upon the jury. *Novosad v. Mid–Century Ins. Co.,* 881 S.W.2d 546, 550 (Tex.App.—San Antonio 1994, no writ).

The following statement in *Pilkington* applies here:

> Applying these principles, we conclude that the jury in the present case could believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness. Indeed, the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony.

*Pilkington v. Kornell,* 822 S.W.2d at 230. Therefore, with all the alternatives available to the jury, we can conclude they were not convinced by a preponderance of the evidence to award damages in any amount greater than that awarded. When we consider all the evidence, we cannot hold that the jury's award of damages is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d at 635. We will not substitute our judgment for that of the jury.

Appellant points out that the award of zero damages for future claims is divided in the jury charge from the past claims and should be considered separately. But, it is noted, both past and future claims are brought under one broad form question, and we have heretofore decided that question adversely to appellant's contentions.

Even if we were to assume the future claims to be a separate damage question with the jury considering each element of damages, we would conclude that the jury finding of "zero" for future damages, which included the elements of future pain and mental anguish and future medical care, is not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. The first point of error is overruled.

The second point of error is that the trial court abused its discretion in denying appellant's motion for new trial because it applied the wrong standard of review. The trial court stated in the order denying the motion for new trial.

> Recognizing a citizen's right to a jury trial and the non-reviewable nature of the granting of a new trial, trial courts are charged with a responsibility to cautiously and prudently exercise their inherent power to disregard a jury's findings and grant a new trial. Trial courts do have a duty to objectively guard against an improper verdict based on prejudice or other improper motives.

> It is not a simple question of whether the court disagrees with the jury, as is often the case. Rather, the determination must be made whether the jury's decision is clearly wrong and manifestly unjust given the uncontroverted and undisputed evidence. Even if the jury's verdict in the instant case appears inadequate, I believe it reflects a deliberate and conscientious decision by the jury based upon interpretation of the evidence.

Appellant's First Amended Motion for New Trial presented to the trial court both factual and legal insufficiency arguments, consequently, the court's Order states: IT IS THEREFORE ORDERED that Plaintiff's Motion for New Trial is DENIED in its entirety. The legal insufficiency contentions were that the plaintiff had established the matters conclusively or as a matter of law. The denial of the motion for new trial thus applied to both the factual and legal insufficiency arguments.

However, on appeal only the factual insufficiency assignment is presented. TEX. R.CIV.P. 324(b)(3). It is appellant's contention that the trial court applied the wrong

standard of review required for a factual insufficiency evaluation.

■ A trial court's refusal to grant a new trial is ordinarily binding on reviewing courts and will be reversed only for a clear abuse of discretion. *Fillinger v. Fuller*, 746 S.W.2d 506, 508 (Tex.App.—Texarkana 1988, no writ).

■ While there are numerous cases involving trial court actions when the motion for new trial is based on jury misconduct or newly discovered evidence, we can find no cases reversing a trial court's order because the trial court applied the wrong standard of review in denying the motion. The reason for the paucity is understandable: the appellate court must apply the correct standard of review. In this case appellant has requested, and the law requires, that this be done. Applying the necessary standard of review, noted in the discussion of point of error one, we have previously overruled the argument that the jury award of damages is so against the great weight and preponderance of the evidence so as to be manifestly unjust.

Therefore, we cannot say the order of the trial court reflects that it applied the wrong standard of review as to the factual insufficiency complaint. On the other hand, even if it had, reversal would serve no purpose. For appellant presented the precise question of factual insufficiency for this court to determine. Point of error two is overruled.

The judgment is affirmed.

HARDBERGER, Justice, concurring.

I concur in the judgment and the review of facts set forth in the majority opinion. However Peterson raises serious questions in this appeal that deserve further analysis not fully dealt with in the majority opinion. Therefore, I respectfully concur.

### The Jury and The Appellate Court

There was evidence in this case to support monetary damage awards for each of the elements submitted to the jury. In fact there was more evidence to support a giving of damages than the jury's finding of zero damages for all elements except the past

medical. It also seems evident that there is some contradiction between the jury's finding of medical expenses and no other compensable damages. Put plainly, where there is medical treatment, and resulting medical bills, there is usually injury, and where there is injury, there is usually pain, and other attendant loses. Counterbalancing these considerations though is the plaintiff's obligation to obtain favorable jury answers because she has the burden of proof. She did not get them. Not obtaining favorable findings on issues where a party has the burden of proof has considerable legal repercussions. The thrust of the law in insufficient evidence claims, in historical terms and modern cases, is to uphold the jury verdict except in very limited circumstances. A jury in this state has great power. Jurors are "the sole judges of the credibility of the witnesses and the weight to be given their testimony." TEX.R.CIV.P. 226a, approved instruction III. Their decision is not to be tampered with lightly, whether it favors the plaintiff or the defendant. The jury has, and should have, the final word on facts.

The supreme court has stated the standard by which we review a factual sufficiency point: we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). "In considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of evidence." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). Reversal is warranted only if a detailing of the evidence shows that the *great* weight of the evidence supports an affirmative answer. *Id.*

It is true, as the appellants point out, that the courts of appeals are the court of last resort on sufficiency of evidence questions. But courts of appeal should use considerable restraint in exercising their power to overturn the jury's work. The Magna Charta

forced King John to give rights to juries, not appellate courts.

The majority opinion sets out several reasons, which don't need to be recited again, as to why the jury may have found as they did. The blunt truth is they didn't think Ms. Peterson was hurt, at least not from this accident. And while the evidence is not overwhelming for such a viewpoint, and there is evidence to the contrary, we find there is sufficient evidence to uphold the verdict.

### Future Medical and Expert Testimony

Appellant points out that both doctors that testified on future medical care agreed that Ms. Peterson would need some future medical care, and as there was no contradictory expert opinion, the court has no choice but to award damages. We cannot agree.

A legion of Texas cases, named below, have held that a plaintiff is not required to have a doctor testify as to future medical damages. The converse of that is that the jury can disbelieve a doctor that does testify.

Texas follows the "reasonable probability" rule for future damages for personal injuries:

Adhering to the "reasonable probability" rule, the Texas courts have also consistently held that the award of future medical expenses is a matter primarily for the jury to determine. No precise evidence is required. The jury may make its award based upon the nature of the injuries, the medical care rendered before trial, and the condition of the injured party at the time of trial. (numerous cases cited).

*Hughett v. Dwyre,* 624 S.W.2d 401, 405 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.). For additional authority and similar wording, see *Furr's, Inc. v. Logan,* 893 S.W.2d 187, 194 (Tex.App.—El Paso 1995). "Plaintiff is not required to establish the future medical consequences of her injury by expert testimony based on reasonable probability." *See also, Beverly Enterprises v. Leath,* 829 S.W.2d 382, 386 (Tex.App.—Waco 1992).

A jury, without the benefit of expert testimony, can look at the nature of the injuries, the medical care rendered before trial, and the condition of the plaintiff at trial and make up their own mind. That is what they did in this case. True, their observations disagreed with the two treating doctors, but the jury has that right. If they didn't have that authority, then there would have to be expert testimony to establish future medical. An expert can be contradicted in more ways than by another expert. He can be contradicted by facts and observations of other witnesses and the parties themselves. Ms. Peterson had nine doctor visits within the three years between the collision and trial. Other events happened that could have caused injury. There was evidence she wasn't hurt at all. That is not overwhelming evidence that future medical is going to be required that can be attributed to this accident.

This court's case of *Novosad v. Mid–Century Ins. Co.,* 881 S.W.2d 546 (Tex.App.—San Antonio 1994) is instructive.

The jury was also free to disbelieve Dr. Dennis' opinion testimony concerning the need for and cost of future medical care. A jury may choose to be guided by expert testimony on future medical damages, but it is not bound by it ... (cites omitted). 'Testimony of experts [on damages] is only evidentiary and not binding upon the trier of fact.'

*Id.* at 550.

The court goes on to explain that there may be some circumstances where uncontroverted expert testimony may be regarded as conclusive if the nature of the subject matter requires the jury to be guided solely by the opinion of experts and the evidence is otherwise credible and free from contradictions and inconsistency. But concludes:

Juries are not bound by a physician's diagnosis as to the future consequences of an injury. *Balandran v. Furr's Inc.,* 833 S.W.2d 648, 652 (Tex.App.—El Paso 1992, no writ) (conflicting diagnoses of MRI dispositive); *Hebert v. Pan Am. Van Lines, Inc.,* 681 S.W.2d at 222 ... When there is expert medical testimony concerning the future consequences of the party's injuries, the jury is not necessarily bound by such testimony. *City of San Antonio v. Vela,* 762 S.W.2d 314, 321 (Tex.App.—San Anto-

nio 1988, writ denied) ... Therefore, this was a matter to be decided by the jury. *Id.* at 551.

## Conclusion

*Pool* requires the court of appeals, when reversing a judgment on insufficiency grounds, to detail in the opinion "the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Pool v. Ford Motor Co.*, 715 S.W.2d at 635. This requirement also applies when the court reverses a jury's failure to find as against the great weight and preponderance of the evidence. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 652–53. There is no such requirement for affirming a judgment. Nevertheless the majority opinion has set out the evidence that would support the verdict. The jury's answers of zero damages to the future elements, and the equivalent of only the medical bills for the past elements, is harsh, but not so "clearly wrong and manifestly unjust" as to require a remand for the trial to be done all over again. While it can be argued that the jury was "wrong" in evaluating this case, a jury within the limits of the law set forth above, has the right to be "wrong." Ultimately conclusions of "right" or "wrong" are subjective evaluations in the mind of the evaluator. The supreme evaluator, in the Anglo–American system, is the jury. The jury has spoken in this case and there is some evidence to support their findings. We decline to disturb them.

DUNCAN, Justice, dissenting.

The majority purports to apply the appropriate standard of review and determines that the jury's damage finding is not "so against the great weight and preponderance of the evidence as to be manifestly unjust." In my view, however, the majority actually overrules Ms. Peterson's points of error because it decides there is "some evidence of probative force" to support the jury's nonfindings. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam).

Because I believe a correct application of the appropriate standard of review mandates a new trial, I respectfully dissent.

As the concurrence suggests, the appropriate standard of review is illustrated in *Novosad v. Mid–Century Ins. Co.*, 881 S.W.2d 546 (Tex.App.—San Antonio 1994, no writ). In *Novosad*, the plaintiff's back was injured as a result of a car accident. The jury awarded $1,760 in lost wages; $7,600 for past and future medical expenses; $10,000 for pain and mental anguish; and $10,000 for physical impairment. *Id.* at 548, 551. On appeal, Novosad contended that the jury's award of $7,600 for past and future medical expenses was against the great weight and preponderance of the evidence "because the medical care award fails to provide for the cost of future surgery." *Id.* at 548. This court disagreed—not because the jury was entitled to reject uncontroverted expert testimony, as the concurring opinion suggests, but because the expert testimony in that case was conflicting.

Novosad's first physician, Dr. Holmes, concluded that Novosad did not need surgery. *Id.* at 548. Novosad's second physician, Dr. Dennis, determined that Novosad did not exhibit the objective signs of a herniated disc, *id.;* therefore, he also did not recommend surgery, although he reported that Novosad may need to consider that possibility. *Id.* at 548–49. "In his deposition, Dr. Dennis stated he chose his words very carefully, and that if he had believed [Novosad] definitely needed surgery ..., he would have said the same in his report." *Id.* at 549. Additionally, Dr. Dennis also stated that "surgery would not be scheduled, or even recommended, unless an epidural injection, a procedure not yet administered, failed to work." *Id.* at 551. A third expert, Dr. Jinkins, reviewed Novosad's MRI and indicated that, although disc herniation was a possibility, "there was '[n]o definite evidence of disc herniation.'" *Id.* at 550. Finally, Novosad herself testified that "she would not even consider surgery unless it was convenient to her work schedule as a teacher." *Id.* at 550.

This court rejected Novosad's argument, noting that "[h]ere there was contradicting expert testimony presented, and even Dr.

Dennis' testimony was not free from contradiction and inconsistency." *Id.* at 550–51. The court concluded that "[i]t is not our place to substitute our judgment for that of the jury, particularly where, as here, the jury has failed to find a fact upon which the appellant had the burden of proof and *conflicting testimony was presented.*" *Id.* at 551 (emphasis added). In my view, the distinctions between *Novosad* and this case demonstrate that applying the well-established standard of review to the record before us mandates that we reverse and remand this case for a new trial.

As mentioned above, Novosad herself testified that "she would not even consider surgery unless it was convenient to her work schedule as a teacher." *Id.* at 550. That is not the situation here. Contrary to defendants' suggestion in their brief, Ms. Peterson did not testify "that she had no plans to ever have surgery." Rather, she testified: "I know there will come a time when I have to have this surgery done," but she said she was "going to stand the pain as long as [she] can." *Novosad* is also distinguishable and indeed instructive in a second respect. The expert testimony before the jury in *Novosad* as to the need for future surgery was conflicting and even internally inconsistent, while in this case the four doctors that testified either expressed no opinion or in substance agreed as to at least one issue—as a result of the accident, Ms. Peterson suffered an injury to her lower back and the lower back injury would, at the very least, require a diagnostic surgical procedure (the discogram) to determine whether corrective surgery would be required.

Four doctors testified regarding Ms. Peterson's physical injuries: Dr. Richter, a general practitioner; Dr. Viola, a chiropractor; Dr. Earle, a spine specialist who is board-certified in orthopedic surgery, spine surgery, and pain management and Ms. Peterson's treating physician; and Dr. Guzman, a board-certified specialist in orthopedic surgery and the independent medical examiner. Dr. Richter saw Ms. Peterson only once on October 26, 1990—three days after the accident. Ms. Peterson was bruised on the right side of her head, her left knee, and her right leg. Dr. Richter testified that, since he did not believe at that time that Ms. Peterson had suffered a spinal injury and because muscle injury can disguise other, more serious injuries, and strong pain medication can cover up these more serious problems, he prescribed only Tylenol and advised Ms. Peterson to return for an orthopedic referral if her problems persisted. Dr. Richter never again saw Ms. Peterson for injuries related to the collision, and he testified, unequivocally, that he would defer to the board-certified experts, Drs. Earle and Guzman, as to whether Ms. Peterson suffered a spinal injury as a result of the accident.

Approximately one month after the accident, at the recommendation of her previous attorney, Ms. Peterson saw Dr. Viola. Dr. Viola performed various physical tests, including x-rays, and determined that, while there was no question but that Ms. Peterson had sustained injuries to her neck and back as a result of the accident, he did not at the time believe that the injuries were permanent. However, Dr. Viola also testified that his examination revealed nothing inconsistent with the reports of Drs. Earle and Guzman. He further explained that a microscopic tear in a disc is often not demonstrated early on and can degenerate to the point that it becomes herniated. After the first visit, Dr. Viola never saw Ms. Peterson again.

Approximately seven months after the accident, on the recommendation of two of her neighbors, Ms. Peterson became a patient of Dr. Earle's; by the time of trial, Dr. Earle had seen Ms. Peterson five times. Additionally, at the request of the defendants, Ms. Peterson was examined by the independent medical examiner, Dr. Guzman. Both Dr. Earle and Dr. Guzman believed Ms. Peterson had suffered an injury to her knee as a result of the collision; however, neither considered the injury permanent, and neither recommended surgery. Both doctors also agreed that Ms. Peterson had suffered an injury to her neck as a result of the accident. They disagreed, however, on the recommended treatment. Dr. Earle believed a discogram would indicate corrective surgery would be required, while Dr. Guzman believed Ms. Pe-

terson would require only an anti-inflammatory medication and exercise.

As to Ms. Peterson's lower back, both Dr. Earle and Dr. Guzman agreed that Ms. Peterson had suffered a permanent injury to her lower back as a result of the collision, and the only definitive means of determining whether this injury would require corrective surgery was to perform a discogram, which is itself a surgical procedure with all the attendant risks. As to Ms. Peterson's lower back injury, the only purported dispute between Drs. Guzman and Earle was actually not a dispute at all. Dr. Guzman gave no opinion as to the probability that a discogram would indicate the need for corrective surgery, while Dr. Earle testified that there was a 51% chance that the discogram would indicate the need for corrective surgery as to one or more discs. Dr. Earle further testified that a discogram would cost approximately $900 and, if required, the surgery on Ms. Peterson's lower back would cost between $55–60,000.

In summary, both Dr. Richter and Dr. Viola deferred to Drs. Earle and Guzman, and Drs. Earle and Guzman agreed that Ms. Peterson had suffered injuries to her neck and lower back as a result of the collision. While they disagreed as to the necessary treatment for Ms. Peterson's neck injury, Drs. Earle and Guzman agreed that Ms. Peterson needed to have a discogram to determine whether corrective surgery on her lower back was indicated. Since Dr. Guzman did not testify either as to the cost of the discogram or as to whether the discogram would indicate the need for corrective surgery, the uncontradicted expert testimony before the jury established:

- To determine whether corrective surgery on her lower back would be required, Ms. Peterson would be required to spend approximately $900 in future medical expenses (the cost of the discogram);
- There was a 51% chance that the discogram would be positive, and Ms. Peterson would be required to undergo corrective surgery on her lower back at a cost of $55–60,000.

The uncontroverted expert testimony thus establishes that, if Ms. Peterson was injured as a result of the accident, she was entitled to at least $900 for the discogram and, in reasonable medical probability, the $55–60,000 for corrective surgery on her lower back. This evidence was not impeached; it was not inconsistent with other evidence; and there was no other discernable reason for the jury, having already found an injury resulting from the collision, to have disregarded it. See William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence," 69 TEXAS L.REV. 515, 524 (1991).

I recognize that non-surgical treatments were recommended by Drs. Richter and Viola shortly after the accident, as pointed out in the majority opinion; however, as noted above, both of these doctors also deferred to the board-certified specialists, Drs. Guzman and Earle, and both explained why their initial diagnoses might differ from those of the specialists. I also recognize that there is some evidence from which the jury could have inferred that Ms. Peterson was not injured or, if she was injured, it was not as a result of the collision, as pointed out in the majority and concurring opinions. However, the jury clearly did not make either inference; instead, the jury expressly found in response to Questions 1, 2, and 3 that Ms. Peterson's injuries resulted from the collision, and the collision was proximately caused by the negligence of the driver, his employer, and Ms. Peterson. Finally, I recognize that Ms. Peterson had discontinued her physical therapy program, and neither the discogram nor any corrective surgery had been performed or scheduled at the time of trial. However, these facts, in my view, are merely some evidence of probative force to support the jury's nonfinding of future damages; they do not render the experts' uncontroverted evidence regarding Ms. Peterson's need for future surgery on her lower back less than "overwhelming."

I would reverse and remand this case for a new trial.